IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Kenneth Hopkins, | ) | C/A No.: 1:17-143-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Nancy A. Berryhill,[1] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this lawsuit.

I.    Relevant Background

A.    Procedural History

On June 28, 2013, Plaintiff filed applications for DIB and SSI in which he alleged his disability began on February 21, 2012. Tr. at 172–86. His applications were denied initially and upon reconsideration. Tr. at 108–12 and 120–21. On August 19, 2015, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Susan Poulos. Tr. at 32–61 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 11, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 13–31. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 18, 2017. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 51 years old at the time of the hearing. Tr. at 36. He completed the ninth grade. Tr. at 37. His past relevant work ("PRW") was as a commercial cleaner and a hand packager. Tr. at 55. He alleges he has been unable to work since February 21, 2012. Tr. at 180.

2.    Medical History

In August 2006, magnetic resonance imaging ("MRI") of Plaintiff's right knee revealed a meniscal tear. Tr. at 358. He underwent arthroscopic surgery on September 14,

2006. Tr. at 366–67. James N. Rentz, Jr., M.D. ("Dr. Rentz"), authorized Plaintiff to return to work without restrictions on October 23, 2006. Tr. at 371.

Plaintiff presented to Terry D. Sims, FNP-BC, PNP-BC ("Mr. Sims"), at Great Falls Family Medicine ("GFFM") on October 15, 2012. Tr. at 356. He complained that his legs were "giving out" and felt as if they were "coming out of the socket." *Id.* He described arthritis pain, as well as a sharp, intermittent pain in the right side of his groin. *Id.* He indicated he believed his pain was related to his obesity. *Id.* Mr. Sims noted that Plaintiff weighed 358 pounds and agreed that his problems were likely related to his obesity. *Id.* He discussed diet and exercise and prescribed Mobic for arthritis and Phentermine for weight loss. *Id.*

On November 12, 2012, Plaintiff complained of pain in his right leg and stated he was unable to lift it. Tr. at 355. He reported the pain was sometimes improved by arthritis medication. *Id.* Mr. Sims noted no abnormalities on physical examination. *Id.* He noted that Plaintiff had lost nine pounds and refilled Phentermine for weight loss. *Id.*

On February 12, 2013, x-rays of Plaintiff's right knee showed osteoarthritic changes. Tr. at 278.

Plaintiff presented to the emergency room ("ER") at Springs Memorial Hospital ("SMH") on May 20, 2013, with a complaint of worsened lower back pain. Tr. at 259. He reported throbbing pain that radiated down the back of his right leg. *Id.* He stated his pain was reduced by lying flat and was exacerbated by sitting and moving. *Id.* An x-ray showed no acute problems and no significant chronic abnormalities. Tr. at 276. The

attending physician diagnosed acute sciatica, lumbar myofascial strain, and lower back pain and prescribed Cyclobenzaprine, Tramadol, and Prednisone. Tr. at 261.

Plaintiff followed up with Mr. Sims on June 11, 2013. Tr. at 354. Mr. Sims indicated Plaintiff was experiencing radiculopathy in his bilateral legs. *Id.* He observed Plaintiff to have an altered gait; to be ambulating with a cane; and to be unable to perform a straight-leg raising ("SLR") test. *Id.* He diagnosed back pain, generalized anxiety disorder, and morbid obesity; prescribed Valium and Lortab; and recommended Plaintiff rest, use heat and compression, and elevate his legs. *Id.*

On July 12, 2013, Plaintiff complained of constant worry, back pain, shortness of breath, chest pain, and occasional numbness and tingling in his bilateral legs. Tr. at 353. Mr. Sims observed that Plaintiff was ambulating with a cane. *Id.* He diagnosed back pain, generalized anxiety disorder, and morbid obesity and continued Plaintiff on his current medications. *Id.*

Plaintiff presented to the ER at Chester Regional Medical Center ("CRMC") for pain in his left shoulder and neck on August 11, 2013. Tr. at 312. He stated he had injured his shoulder while lifting and carrying a heavy object. Tr. at 318. The attending physician diagnosed shoulder strain and prescribed Norco. Tr. at 317.

Plaintiff presented to the ER at SMH for lower back pain and nausea on August 17, 2013. Tr. at 286. The attending physician diagnosed dysuria and prescribed Cipro and Lortab. Tr. at 290.

On September 3, 2013, Plaintiff presented to the ER at CRMC for back pain. Tr. at 311. The attending physician observed Plaintiff to have full range of motion ("ROM"),

5/5 motor strength, and normal gait. Tr. at 315. He diagnosed lumbar myofascial strain and prescribed Flexeril and Norco. Tr. at 313.

Plaintiff presented to Harriet Steinert, M.D. ("Dr. Steinert"), for a consultative examination on September 11, 2013. Tr. at 342–46. He reported that he walked with a cane most of the time because his legs would sometimes buckle. Tr. at 342. He endorsed pain in all joints and indicated his hearing was impaired by constant ringing. *Id.* Plaintiff reported decreased sensation to touch in the third, fourth, and fifth fingers of his right (dominant) hand. *Id.* Dr. Steinert noted Plaintiff had not undergone an electromyography ("EMG") of his right upper extremity. *Id.* Plaintiff denied having chronic obstructive pulmonary disease ("COPD"), but endorsed frequent shortness of breath and a history of chronic bronchitis. *Id.* He indicated he experienced urinary frequency and pelvic pain that were caused by an enlarged prostate. *Id.* He stated he experienced leg numbness if he sat for more than 20 minutes at a time. *Id.* He estimated he could walk 100 feet, but indicated he felt as if his hip joints would pop out while he was walking. *Id.* He stated he had sleep apnea, but denied using a continuous positive airway pressure ("CPAP") machine because it made him feel as if he were choking. Tr. at 343. He indicated he was prescribed Xanax because he felt "stressed out," but he denied having visited a mental health clinic or having been hospitalized for mental illness. *Id.* Dr. Steinert observed that Plaintiff was morbidly obese at 5'7" tall and 350 pounds. *Id.* She noted Plaintiff walked into the examination room with a cane, but climbed on to the examination table without assistance. *Id.* She stated Plaintiff had full ROM of all joints in his extremities. Tr. at 344. He demonstrated no swelling, erythema, deformities, or tenderness to palpation of his

joints. *Id.* He had no peripheral edema in his extremities. *Id.* His grip strength was normal, and he had normal fine and gross motor skills in both hands. *Id.* He had no atrophy in his extremities and had normal and equal deep tendon reflexes. Tr. at 345. Dr. Steinert observed Plaintiff to flex at the waist to 60 degrees; extend to five degrees; and laterally flex fully, with complaints of pain. *Id.* She noted no tenderness to palpation in Plaintiff's thoracic or lumbar spine or paraspinous muscles. *Id.* She observed Plaintiff to walk across the room with a normal gait and no assistive device. *Id.* Plaintiff was unable to walk on his toes and heels or to tandem walk. *Id.* He could not rise from a squatting position. *Id.* Plaintiff demonstrated no sensory or motor deficits, but reported a needle-like sensation when Dr. Steinert touched his right third, fourth, and fifth fingers. *Id.* Dr. Steinert observed that Plaintiff was unable to fit into a normal chair because of his obesity. *Id.* She stated Plaintiff did not experience shortness of breath during the examination. *Id.* She noted Plaintiff had decreased ROM of his lumbar spine and complained of pain with movement. *Id.* She diagnosed morbid obesity, chronic lumbar spine pain of uncertain etiology, tinnitus, and benign prostatic hypertrophy. *Id.*

On September 11, 2013, state agency psychological consultant Xanthia Harkness, Ph.D. ("Dr. Harkness"), completed a psychiatric review technique form ("PRTF"). Tr. at 64–65. She considered Listing 12.06 for affective disorders, but found that Plaintiff's mental impairments were not severe because they caused only mild restriction of activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. *Id.*

State agency medical consultant Donna Stroud, M.D. ("Dr. Stroud"), completed a physical residual functional capacity ("RFC") assessment the same day. Tr. at 65–67. She found that Plaintiff had the following restrictions: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; frequently climbing ramps and stairs; occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ladders, ropes, and scaffolds; must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; and must avoid concentrated exposure to hazards. *Id.*

Plaintiff complained of pain in his right arm, left shoulder, and lower back on September 19, 2013. Tr. at 352. Mr. Sims noted that Plaintiff had visited the ER and was seeking disability benefits. *Id.* He ordered a new cane. *Id.*

Plaintiff presented to the ER at CRMC on October 14, 2013, with right arm numbness. Tr. at 484. The attending physician diagnosed resolved right arm radiculopathy. *Id.* He encouraged Plaintiff to continue to take his anti-inflammatory medications and to consider obtaining an MRI if his symptoms persisted. *Id.*

On October 29, 2013, Plaintiff presented to the ER at SMH, after having sustained a fall from a chair. Tr. at 534. He complained of pain in his back and left hip. *Id.* The attending physician observed Plaintiff to be in mild distress; to have moderate tenderness to palpation of his hip; and to ambulate with a slow gait and use of a cane. Tr. at 536. He diagnosed a left hip contusion and prescribed Norco. *Id.*

On October 31, 2013, Plaintiff reported that Norco was not helpful and that he was continuing to experience sharp pain in his hip. Tr. at 351. Mr. Sims observed Plaintiff to have decreased ROM in his extremities and to be unable to perform the SLR test. *Id.* He diagnosed back pain and bilateral hip pain; prescribed Norco; and recommended rest, heat, compression, and elevation. *Id.* He suggested that Plaintiff obtain an MRI, but Plaintiff indicated he was unable to afford it. *Id.*

Carl Anderson, M.D. ("Dr. Anderson"), a second state agency medical consultant, completed a physical RFC assessment on December 12, 2013. Tr. at 87–89. He indicated Plaintiff was restricted as follows: occasionally lifting and/or carrying 50 pounds; frequently lifting and/or carry 25 pounds; standing and/or walking for a total of about six hours in an eight-hour workday; sitting for a total of about six hours in an eight-hour workday; never climbing ladders, ropes, or scaffolds; frequently balancing, stooping, kneeling, and crouching; never crawling or climbing ladders, ropes, or scaffolds; must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; and must avoid concentrated exposure to hazards. *Id.*

On December 18, 2013, a second state agency psychological consultant, Anna P. Williams, Ph.D. ("Dr. Williams"), completed a PRTF and found that Plaintiff's mental impairments were not severe. Tr. at 86–87.

Plaintiff presented to the ER for breathing difficulty and was diagnosed with acute bronchitis on December 23, 2013. Tr. at 486–97.

Mr. Sims refilled Plaintiff's prescriptions for Xanax and Norco on January 13, 2014. Tr. at 738.

Plaintiff followed up with Mr. Sims for chest pain and discomfort, shortness of breath while walking, and depression on February 24, 2014. Tr. at 735–36.Mr. Sims advised Plaintiff to rest, use heat, and elevate his extremities. Tr. at 737.

On March 25, 2014, Plaintiff complained of lower back pain and dyspnea. Tr. at 732. Mr. Sims observed Plaintiff to be in mild distress and to ambulate with a cane. Tr. at 734. He advised Plaintiff to rest, use heat, and elevate his extremities. Tr. at 735.

Plaintiff presented to the ER with abdominal pain on April 3, 2014. Tr. at 499. The attending physician diagnosed cellulitis of the trunk and prescribed Septra. Tr. at 498.

Plaintiff presented to Catawba Mental Health for an initial clinical assessment on April 9, 2014. Tr. at 863. He indicated his mind was constantly racing and that he was unable to sleep at night. *Id.* He stated he had experienced significant weight gain as a result of overeating. *Id.* He reported a history of physical and sexual abuse and marital problems. *Id.* He endorsed suicidal ideation, but indicated he would not act on his thoughts because of his religious beliefs. *Id.* Tamara Edington, MS ("Ms. Edington"), observed Plaintiff to be appropriately oriented; to have an anxious and depressed mood and an appropriate affect; to demonstrate normal speech and thought content; to show no evidence of hallucinations or delusions; to have intact memory; and to demonstrate easily-distracted concentration and attention. Tr. at 865–66. She recommended that Plaintiff receive mental health treatment. Tr. at 867.

Plaintiff presented to Ms. Edington on April 24, 2014. Tr. at 861. Ms. Edington observed Plaintiff to be tearful, but alert and oriented. *Id.* Plaintiff reported increased

appetite and decreased sleep and energy level. *Id.* Ms. Edington scheduled Plaintiff for a medical evaluation and therapy sessions. *Id.*

On April 30, 2014, Plaintiff's weight had increased to 386 pounds. Tr. at 730. He reported depression and decreased ADLs. Tr. at 731. Mr. Sims observed Plaintiff to be depressed and anxious; to have limited ROM; and to be unable to perform the SLR test. *Id.* He refilled Plaintiff's prescriptions for Norco and Xanax; discussed diet, exercise, and weight loss; and advised rest, use of heat, and elevation of the extremities. Tr. at 732.

On May 8, 2014, Plaintiff reported to Ms. Edington that he would isolate himself from others and overeat. Tr. at 862. Ms. Edington indicated Plaintiff had started to discuss and process issues that were bothering him. *Id.*

On May 29, 2014, Mr. Sims observed Plaintiff to be in mild distress; to demonstrate an irregular gait and to use a cane to ambulate; to have reduced ROM; and to be unable to perform the SLR test. Tr. at 728. He prescribed Norco, Mobic, and Xanax; advised Plaintiff to rest, use heat, and elevate his extremities; and discussed diet, exercise, and weight loss. Tr. at 728–29.

On June 3, 2014, Mr. Sims noted Plaintiff was in moderate distress, had limited ROM, demonstrated an irregular gait, and was unable to perform the SLR test. Tr. at 725. He continued Plaintiff's medications. *Id.*

Plaintiff discussed his family stressors with Ms. Edington on June 16, 2014. Tr. at 868. He indicated that his father-in-law, who had been living with him, had recently passed away. *Id.* He felt as if he could be more assertive because his mother-in-law and other family members no longer had a reason to visit his house all the time. *Id.* Plaintiff

followed up with Christie Williamson, M.D. ("Dr. Williamson"), the same day for an initial assessment. Tr. at 869. Ms. Williamson noted that Plaintiff had been noncompliant with therapy over prior weeks. *Id.* Plaintiff indicated he was becoming less mobile because of his obesity and health problems. *Id.* Dr. Williamson observed Plaintiff to be appropriately oriented, to have a tired mood and an appropriate affect, and to demonstrate fair judgment and insight. *Id.* She diagnosed post-traumatic stress disorder ("PTSD"), history of childhood sexual abuse, and history of physical abuse and assessed a global assessment of functioning ("GAF")[2] score of 61.[3] Tr. at 870. She prescribed Prozac and Trazodone and encouraged Plaintiff to follow up for regular therapy. *Id.*

On June 26, 2014, Plaintiff reported that he had sustained multiple falls and requested Mr. Sims's permission to use his father's walker. Tr. at 719. Mr. Sims observed Plaintiff to be in mild distress; to have limited ambulation and an irregular gait; to demonstrate a normal mood and affect; to have limited ROM; and to be unable to perform the SLR test. Tr. at 720–21. He prescribed Norco, Losartan, Xanax, and Mobic, advised Plaintiff to rest, use heat, and elevate his lower extremities, and recommended that he use a walker to prevent falls. Tr. at 722.

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[3] A GAF score of 61−70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *DSM-IV-TR.*

Plaintiff followed up with Ms. Edington for individual therapy on July 2, 2014. Tr. at 872. He complained that he did not feel like he could express his opinions in his home. *Id.* He indicated he wanted to better express his feelings and make changes, but feared he would be unsuccessful. *Id.*

On July 28, 2014, Plaintiff reported improved sleep, but continued to endorse frequent crying spells. Tr. at 873. He denied changes as a result of his medications. Tr. at 874.

Plaintiff reported poor mood with only mild improvement on August 1, 2014. Tr. at 875. He indicated he was tearful at times. *Id.* Ms. Williamson continued Plaintiff on Trazodone. Tr. at 876.

Plaintiff presented to human services coordinator Kimberly Sconyers ("Ms. Sconyers") for an individual therapy session on August 14, 2014. Tr. at 877. He reported that he was doing well, sleeping well, and feeling positive. *Id.*

Plaintiff presented to the ER at CRMC following a motor vehicle accident on August 25, 2014. Tr. at 505. He endorsed neck pain and tenderness. *Id.* X-rays of his cervical spine showed cervical spondylosis and minimal changes of osteoarthritis. Tr. at 511–12. The attending physician diagnosed acute neck pain, whiplash, and chronic pain syndrome and prescribed Flexeril and Norco. Tr. at 504.

Plaintiff reported exercise intolerance and fatigue on September 25, 2014. Tr. at 713. Mr. Sims observed Plaintiff to demonstrate an irregular gait and to be ambulating with a walker. Tr. at 713–14. He noted Plaintiff was anxious, depressed, and agitated and had abnormal recent memory. Tr. at 713. He indicated Plaintiff had limited ROM and

difficulty rising from a seated position and was unable to perform the SLR test. Tr. at 713–14. Mr. Sims prescribed Norco, Meloxicam, and Xanax and advised Plaintiff to rest, use heat, and elevate his lower extremities. Tr. at 714–15.

Plaintiff was admitted to SMH from September 30, through October 1, 2014, for chest pain. Tr. at 381–98. He indicated he had been driving all day and had experienced a sudden onset of chest pain when he returned home to take a nap. Tr. at 381. The attending physician observed Plaintiff to have trace pitting edema in his lower extremities, but no other abnormalities. Tr. at 382. She ruled out acute coronary syndrome and determined Plaintiff's chest pain was likely musculoskeletal in etiology. Tr. at 385. Plaintiff's discharge diagnoses included morbid obesity, hypertension, hyperlipidemia, anxiety, chronic pain syndrome, and chronic tobacco abuse. *Id.*

Plaintiff followed up with Mark A. Ciminelli, M.D. ("Dr. Ciminelli"), regarding chest pain on October 14, 2014. Tr. at 399–400. Dr. Ciminelli stated an echocardiogram suggested mitral regurgitation and a questionable segmental wall motion abnormality with overall systolic dysfunction at the low limit of normal. Tr. at 399. He diagnosed acute chest pain, benign essential hypertension, shortness of breath, and obesity. Tr. at 400. He noted Plaintiff's symptoms were consistent with angina. *Id.* He recommended Plaintiff undergo a nuclear stress test or left heart catheterization, but Plaintiff was unable to afford the tests. *Id.*

On October 16, 2014, Dr. Williamson noted that Plaintiff had missed his most recent appointment. Tr. at 879. She notified Plaintiff by telephone that she would refill

his prescriptions for Prozac and Trazodone. *Id.* Plaintiff was discharged from Catawba Mental Health on October 24, 2014, after he dropped out of treatment. Tr. at 880.

Plaintiff complained of back pain on October 27, 2014. Tr. at 708. Mr. Sims observed Plaintiff to demonstrate an irregular gait, to ambulate with a walker, to be in moderate distress, to appear anxious, depressed, and agitated, to have abnormal recent memory, to demonstrate limited ROM, to have difficulty rising from a seated position, and to be unable to perform the SLR test. Tr. at 709–10. He prescribed Norco and advised Plaintiff to rest, use heat, and elevate his lower extremities. Tr. at 711.

Mr. Sims observed Plaintiff's physical examination to be unchanged on November 24, 2014. Tr. at 706. He refilled Norco and again advised Plaintiff to rest, use heat, and elevate his lower extremities. Tr. at 707.

Mr. Sims noted similar findings on physical examination on December 22, 2014. Tr. at 702. He prescribed Losartan, Xanax, and Norco, advised Plaintiff to rest, use heat, and elevate his lower extremities, and discussed diet, exercise, and weight loss. Tr. at 703–04.

Plaintiff presented to the ER at CRMC for flank pain on January 1, 2015. Tr. at 514. The attending physician observed Plaintiff to be moderately-tender to palpation in his right lateral anterior chest. Tr. at 516. He diagnosed chest wall strain and advised Plaintiff to continue taking his prescribed medications. Tr. at 519.

Plaintiff complained that his back pain was radiating down his bilateral legs on January 19, 2015. Tr. at 698. He reported swelling in his extremities and difficulty walking. *Id.* Mr. Sims observed Plaintiff to demonstrate poor insight and to be depressed,

anxious, and agitated. *Id.* He noted Plaintiff was using a walker, demonstrated an irregular gait, had limited ROM, was unable to perform the SLR test, and had difficulty rising from a seated position. *Id.* He prescribed Norco for pain. Tr. at 700.

On February 16, 2015, Plaintiff reported that he had recently sustained a fall from his porch. Tr. at 693. He complained of back pain with radiculopathy. *Id.* Mr. Sims observed Plaintiff to be in moderate distress, to appear chronically ill, to have limited ROM, to be unable to perform the SLR test, and to have difficulty rising from a seated position. Tr. at 694. He noted Plaintiff continued to be anxious, depressed, and agitated. *Id.* He prescribed Prozac and advised Plaintiff to rest, use heat, and elevate his lower extremities. Tr. at 696.

Plaintiff reported back pain and worsening arthritis pain on March 19, 2015. Tr. at 687. Mr. Sims's observations were consistent with prior examinations. Tr. at 690. He prescribed Losartan and Norco and advised Plaintiff to rest, use heat, and elevate his lower extremities. Tr. at 691.

Plaintiff presented to Mr. Sims with suicidal ideation on March 26, 2015. Tr. at 683. He felt like he was a burden to his family. *Id.* He reported that his back pain was so severe that he had difficulty walking with a walker. Tr. at 684. Mr. Sims observed Plaintiff to appear acutely ill and in moderate distress. Tr. at 685. He noted Plaintiff was anxious, depressed, and agitated, had poor insight, demonstrated an abnormal affect, and had abnormal recent memory. Tr. at 686. He also indicated Plaintiff had an irregular gait and limited ROM, was unable to perform the SLR test, and had difficulty rising from a

seated position. *Id.* Mr. Sims discussed Plaintiff's thoughts and prescribed Prozac and Trazodone. Tr. at 687.

Plaintiff was hospitalized at Piedmont Medical Center from April 2, through April 4, 2015, for suicidal ideation with a plan to poison himself with carbon monoxide. Tr. at 403–59. He expressed displeasure with his appearance and indicated he did not like having to be dependent on his family members for assistance with self-care activities. Tr. at 435. He was transferred to Aurora Pavilion, where he was involuntarily committed from April 4, through April 10, 2015. Tr. at 460–77. Plaintiff reported that he had been eating when he felt depressed and was unable to exercise because he was easily tired, secondary to his weight. Tr. at 460. He complained of significant marital and family conflicts, multiple medical problems, and an inability to work. *Id.* He stated he felt like he was a burden to his wife. *Id.* At the time of discharge, Merry Deleon, M.D. ("Dr. Deleon"), observed Plaintiff to have a sad and constricted affect and a dysphoric mood, but was able to focus think based on reality. Tr. at 477. Plaintiff's discharge diagnoses included benign essential hypertension, obstructive sleep apnea, osteoarthritis, morbid obesity, depression due to general medical condition, and severe, recurrent major depression. Tr. at 473. Dr. Deleon advised Plaintiff to follow up with a mental health provider. *Id.*

Plaintiff presented to Dana McNeal, M.A. ("Ms. McNeal"), on April 13, 2015. Tr. at 881. He reported depression and suicidal ideation. *Id.* He developed a safety plan with Ms. McNeal, and she scheduled him for an assessment. *Id.*

Plaintiff complained that his arthritis pain was worsening and that he was barely able to walk with a walker on April 16, 2015. Tr. at 679. Mr. Sims observed Plaintiff to be anxious, depressed, and agitated, to demonstrate an abnormal affect, and to have impaired recent memory. Tr. at 681. He noted Plaintiff had an irregular gait and limited ROM and was unable to perform the SLR test or to rise from a seated position. Tr. at 682. He prescribed Norco and advised Plaintiff to rest, increase his fluid intake, use a cool mist humidifier, follow a diet and exercise plan, use heat, and elevate his lower extremities. Tr. at 683.

On April 20, 2015, Plaintiff followed up with Dr. Williamson, who added a prescription for Wellbutrin. Tr. at 882. Ms. McNeal indicated Dr. Williamson had advised that Plaintiff be further assessed and referred to a benefits specialist to apply for disability. Tr. at 883.

Plaintiff followed up with Ms. McNeal and reviewed the safety plan on May 1, 2015. Tr. at 546.

The same day, Plaintiff presented to the ER after having sustained a fall and injured his left shoulder while walking his dog. Tr. at 546. The attending physician observed Plaintiff to be anxious and to ambulate with a walker. Tr. at 546 and 547. She noted Plaintiff had intact sensation, decreased ROM, and tenderness in his left shoulder. Tr. at 549.

Plaintiff again presented to the ER at CRMC on May 4, 2015. Tr. at 520. He complained of lower back pain and nausea. Tr. at 521. X-rays of Plaintiff's lumbar spine showed hypertrophic changes in the facet joints at L3-4, L4-5, and L5-S1 and mild

changes of lumbar spondylosis at L3-4 and L4-5. Tr. at 525. The radiologist indicated it was likely that Plaintiff had spinal stenosis. *Id.* The attending physician diagnosed acute lower back pain and chronic lower back pain. Tr. at 524.

Plaintiff followed up with Ms. McNeal on May 14, 2015. Tr. at 885. They reviewed the safety plan to determine whether revisions were needed. *Id.* Plaintiff denied suicidal and homicidal ideation. *Id.*

On May 14, 2015, Plaintiff complained of fatigue. Tr. at 676. Mr. Sims indicated the combination of Prozac and Wellbutrin had benefitted Plaintiff. *Id.* He observed Plaintiff to be anxious, depressed, and agitated, to have poor insight, to have limited ROM, to be unable to perform the SLR test, and to have difficulty rising from a seated position. Tr. at 677. He referred Plaintiff for an orthopedic examination, prescribed Xanax and Norco, advised diet, exercise, and weight loss, and instructed him to rest, use heat, and elevate his lower extremities. Tr. at 679.

On May 15, 2015, x-rays of Plaintiff's lumbar spine showed normal vertebral alignment, maintained intervertebral disc spaces, mild changes of lumbar spondylosis, minimal facet joint osteoarthritis, and normal SI joints. Tr. at 528–29.

Plaintiff presented to James Dallis, M.D. ("Dr. Dallis"), for lower back pain on May 18, 2015. Tr. at 588. He reported constant bilateral pain that was worse on the right than the left. Tr. at 590. He rated his pain as a six on a 10-point scale, but indicated it increased to a "10" at times. *Id.* He endorsed pain in his neck and upper back and intermittent weakness in his lower extremities. Tr. at 591. Dr. Dallis observed Plaintiff to

be tender in his cervical, thoracic, and lumbar spine and to have limited ROM. Tr. at 592. He referred Plaintiff for physical therapy and diagnostic testing. Tr. at 592–93.

Plaintiff reported to Dr. Williamson for evaluation on June 1, 2015. Tr. at 886. He indicated he felt tearful and experienced guilt over being unable to financially contribute to his household. *Id.* He stated he was easily upset and agitated. *Id.* He denied suicidal ideation and indicated he had recently lost some weight. *Id.* Dr. Williamson observed Plaintiff to ambulate with an unbalanced gait and to use a four-prong walker. Tr. at 887. She noted that Plaintiff appeared unkempt; had an inappropriate affect; seemed nervous; demonstrated below average language skills; and smiled inappropriately. *Id.* She indicated Plaintiff had good judgment, fair insight, and intact memory, attention, and concentration. *Id.* She noted that Plaintiff would try to change the subject when she suggested efforts to change his lifestyle. *Id.* Dr. Williamson diagnosed PTSD and a history of childhood sexual abuse and assessed a GAF score of 62. *Id.* She prescribed Prozac, Trazodone, Xanax, and Wellbutrin and noted that Plaintiff was also taking Losartan, Norco, and Meloxicam. *Id.*

On June 1, 2015, x-rays of Plaintiff's thoracic spine showed marginal osteophyte formation prominently within the mid and lower dorsal regions that were consistent with diffuse idiopathic skeletal hyperostosis. Tr. at 568. An MRI of Plaintiff's lumbar spine indicated mild central canal stenosis at L1-2, L2-3, L3-4, and L4-5 and a small disc extrusion or disc/osteophyte complex at L5-S1. Tr. at 569–70.

Plaintiff rated his depression as a four on a 10-point scale on June 4, 2015. Tr. at 888. He indicated he felt too tired to address any problems. *Id.* Ms. McNeal observed that

Plaintiff continued to make excuses for his depressed mood and failed to set limits with family members. *Id.*

Plaintiff complained of midline lower back pain that he described as sharp and throbbing on June 5, 2015. Tr. at 584. Dr. Dallis reviewed the MRI results and diagnosed lumbago, degeneration of the lumbosacral intervertebral disc, spinal stenosis of the lumbar region, and prolapsed intervertebral disc. Tr. at 587. He referred Plaintiff for a pain management evaluation and possible nerve block injections. *Id.*

Plaintiff presented to the ER at SMH with left ankle pain and swelling on June 10, 2015. Tr. at 551. The attending physician observed Plaintiff to have limited active ROM in the left ankle. Tr. at 554. An x-ray showed bimalleolar soft tissue swelling and heel spurs, but no fracture. Tr. at 558. The attending physician diagnosed an ankle sprain and discharged Plaintiff with a splint. Tr. at 555. She advised Plaintiff to rest, use ice, elevate his leg, and take his pain medications. *Id.*

Plaintiff followed up with Mr. Sims the next day. Tr. at 669. Mr. Sims noted the same findings that he had indicated during prior exams. Tr. at 671–72. He prescribed Losartan and advised Plaintiff to rest, use heat, and elevate his lower extremities. Tr. at 672–73.

Dr. Dallis evaluated Plaintiff's ankle pain on June 19, 2015. Tr. at 580. Plaintiff weighed 369 pounds. Tr. at 581. Dr. Dallis observed that Plaintiff had a normal gait, no limp, and ambulated with no assistive device. Tr. at 582. He noted no abnormalities on physical examination, aside from a flat foot deformity. Tr. at 582–83. He referred Plaintiff to be fitted for orthotics. Tr. at 583.

Dr. Williamson completed a medical source statement on June 25, 2015. Tr. at 595–97. She indicated Plaintiff would be mildly limited in his abilities to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions. Tr. at 595. She described Plaintiff as being moderately limited in his abilities to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. *Id.* She stated Plaintiff's mood and anxiety caused him to experience decreased focus. *Id.* She indicated Plaintiff was mildly restricted in his abilities to interact appropriately with the public, supervisors, and coworkers and to respond appropriately to usual work situations and to changes in a routine work setting. Tr. at 596. She explained that Plaintiff's worry and low mood would affect his interactions. *Id.* She stated Plaintiff had decreased mobility when his mood was down. *Id.* She indicated her impressions were supported by Plaintiff's April 2015 hospitalization and that she felt Plaintiff's limitations had been present since June 16, 2014. *Id.*

On June 25, 2015, Ms. McNeal indicated Plaintiff's treatment goal was to decrease his depressive symptoms. Tr. at 889. Plaintiff discussed his family stressors. *Id.* He indicated he was excited about potentially undergoing gastric bypass surgery. *Id.* Ms. McNeal noted that Plaintiff continued to complain of the same problems, but was unwilling to take action for resolution. *Id.*

Plaintiff was hospitalized on July 7, 2015, after he reported sudden left-sided chest pain, nausea, diaphoresis, lightheadedness, slurred speech, and heaviness that radiated to his back. Tr. at 599–655. Plaintiff complained of difficulty finding words and left arm

and leg numbness, tingling, and weakness. Tr. at 605. The attending physician observed that "[a]t times," Plaintiff "stops during our conversation and states that he needs to think about the words coming out of his mouth, although he clearly is able to make that statement to me." Tr. at 602. He indicated Plaintiff had some mild left upper and lower extremity weakness, but stated there seemed to be "some inconsistency with his exam." *Id.* An MRI of Plaintiff's head showed no abnormalities. Tr. at 649. He diagnosed chest pain, dyspnea, and transient ischemic attack. Tr. at 633.

On July 14, 2015, Plaintiff complained of muscle aches, extremity swelling, difficulty walking, and tiredness. Tr. at 666. Mr. Sims observed Plaintiff to have limited ambulation and irregular gait; to be using a walker; to have reduced ROM; to be unable to perform the SLR test; and to have difficulty rising from a seated position. *Id.* He described Plaintiff as appearing acutely ill and in moderate distress. *Id.* He noted Plaintiff had good judgment, but poor insight. *Id.* He observed Plaintiff to have an abnormal affect and to be anxious, depressed, and agitated. *Id.* He indicated cardiac problems had been ruled out and that Plaintiff's chest pain was possibly stress-related. Tr. at 664. Mr. Sims diagnosed osteoarthritis, benign essential hypertension, lower back pain, ankle edema, ankle pain, degeneration of lumbosacral and cervical intervertebral discs, spinal stenosis of the lumbar region, morbid obesity, major depressive disorder, and chronic fatigue syndrome. Tr. at 667–68. He prescribed Meloxicam; recommended exercise and weight loss; and advised Plaintiff to rest, use heat, and elevate his lower extremities. Tr. at 668.

Mr. Sims provided an opinion with respect to Plaintiff's physical capacities on July 14, 2015. Tr. at 656–59. He indicated Plaintiff was limited as follows: sit for less

than one hour in an eight-hour workday; stand/walk for less than one hour in an eight-hour workday; requires the ability to alternate between sitting and standing at will throughout the day; unable to use hands adequately for simple grasping, fine manipulation, and pushing/pulling; unable to use hands for repetitive motion tasks; unable to use feet for repetitive movements; occasionally lift/carry zero to five pounds; never lift six pounds or greater; never climb, balance, stoop, kneel, crouch, crawl, or reach above shoulder level; and must avoid unprotected heights, moving machinery, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes, and gases. Tr. at 656–57. He stated Plaintiff suffered from fatigue that was disabling to the extent that it prevented him from working full-time in even a sedentary position. Tr. at 657. He confirmed that Plaintiff experienced pain. Tr. at 658. He indicated Plaintiff's leg and back pain were exacerbated by his obesity and stated Plaintiff was nearly immobile as a result of his morbid obesity. *Id.* He opined that Plaintiff's pain was disabling to the extent that it would preclude him from working full-time in even a sedentary position. *Id.* Mr. Sims indicated Plaintiff's pain and the side effects of his medications severely affected his attention and concentration to the extent that he would be unable to perform even simple, unskilled work tasks. Tr. at 659.

On July 21, 2015, Plaintiff expressed displeasure with his household situation, but indicated he had no recourse because he was unable to work. Tr. at 890. Ms. McNeal confronted Plaintiff about his failure to take efforts to resolve his problems. *Id.* David W. Roseboro, RN ("Mr. Roseboro"), indicated Plaintiff was compliant with his medications. Tr. at 891. Plaintiff stated he played the guitar in his church and had recently taught his

23

granddaughter to play. Tr. at 892. He reported his medications were helpful, but he continued to experience depression, irritability, and anxiousness. *Id.* He indicated his back pain had worsened, despite the fact that he had managed to lose 40 pounds. *Id.* Mr. Roseboro reminded Plaintiff to seek help if he experienced suicidal thoughts. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on August 19, 2015, Plaintiff testified he was 5'10" tall and weighed 360 pounds. Tr. at 36. He indicated he lived with his wife, daughter, and his five- and six-year-old grandchildren. Tr. at 36–37.

Plaintiff claimed he last worked in 2012. Tr. at 39. He stated his employer had replaced him with another employee because he could not meet the job's physical demands. *Id.*

Plaintiff testified that he was unable to work because of pain and numbness in his lower back, hips, and bilateral legs. Tr. at 41. Plaintiff stated his back pain was always present, but was not always as severe. Tr. at 46. He described the pain that radiated from his lower back as feeling like fire running into his legs and feet and "a thousand needles pricking out of the bottom." Tr. at 41. He stated it sometimes felt like a knife twisting and other times felt like a paralyzing pressure and catching pain in his bilateral hips and through his legs. Tr. at 46. He testified that the pain in his legs sometimes caused him to fall. *Id.*

He indicated he experienced pain in his neck and shoulders and numbness in his right arm and three fingers of his right hand. Tr. at 45 and 47. He described a shooting pain that radiated from his left arm down his left leg and into his hip. Tr. at 45. He endorsed pain in all his joints, but indicated it was worse in his knees, elbows, and feet. Tr. at 47. He described the joint pain as feeling like his bones were "scrubbing together." Tr. at 48. He reported numbness in his hands, feet, legs, and lower back and swelling in his feet. *Id.*

Plaintiff endorsed symptoms of depression that included racing thoughts, sleep disturbance, feelings of worthlessness, mood swings, and crying spells. Tr. at 51 and 52. He indicated he experienced panic attacks approximately every two months. Tr. at 51.

Plaintiff testified that he could stand for a maximum of three minutes if he was not leaning against or holding on to something. Tr. at 41–42. He stated his treating nurse practitioner had prescribed a walker that he had been using for about a year. Tr. at 40 and 48. He claimed he had previously used a cane to ambulate. Tr. at 48. He indicated he was able to walk less than 20 yards. Tr. at 42. He estimated he could sit for 20 minutes without elevating his lower extremities. *Id.* He indicated he could lift approximately 10 pounds. Tr. at 43. He indicated he was taking Hydrocodone and Meloxicam for pain. Tr. at 41.

Plaintiff testified that he spent most of a typical day sitting in his lounge chair with his feet elevated while watching television. Tr. at 44. He stated he attended church on Wednesdays and Sundays. *Id.* He indicated he was unable to stand to prepare meals or

wash dishes. Tr. at 44–45. He endorsed impaired sleep and indicated he was unable to sleep without medication. Tr. at 49.

Plaintiff stated he had considered gastric bypass surgery, but his insurer had declined to cover it. Tr. at 43. He denied babysitting his grandchildren during the day. Tr. at 44. He indicated he could engage in minimal reading and writing, but was unable to complete a job application. Tr. at 45. He testified that his wife assisted him in using the restroom, bathing, and dressing. Tr. at 50.

b.    Vocational Expert Testimony

Vocational Expert ("VE") G. Roy Sumpter, Ph.D., reviewed the record and testified at the hearing. Tr. at 54–59. The VE categorized Plaintiff's PRW as a commercial cleaner, *Dictionary of Occupational Titles* ("*DOT*") number 381.687-014, as requiring heavy exertion and having a specific vocational preparation ("SVP") of two, and a hand packager, *DOT* number 920.587-018, as requiring medium exertion and having an SVP of two. Tr. at 55. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the light exertional level with no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, and crouching; no crawling; occasional exposure to pulmonary irritants such as dust, fumes, odors, and gases; and occasional exposure to work-related hazards, such as unprotected heights and dangerous machinery. *Id.* The VE testified that the hypothetical individual could perform jobs at the light exertional level with an SVP of two as a small products assembler I, *DOT* number 706.684-022, with 207,000 positions in the national economy; a storage facility rental

clerk, *DOT* number 295.367-026, with 430,000 positions in the national economy; and a final inspector, *DOT* number 727.687-054, with 472,000 positions in the national economy. Tr. at 56.

The ALJ asked if the positions could generally be performed in either a seated or standing position. *Id.* The VE responded that the small products assembler and storage facility rental clerk jobs could be performed in a seated position, but the number of final inspectors would be reduced by half to accommodate a sit/stand option. *Id.*

The ALJ asked the VE to indicate the typical breaks allowed during a workday. *Id.* The VE responded that most jobs would allow morning and afternoon breaks of 10 to 15 minutes and 30 to 60 minutes for lunch or dinner. *Id.* He indicated most employers would not permit additional breaks that would render an employee off task for 10% of the workday. *Id.*

The ALJ asked if any jobs would be available if an individual were off task for 20% or more of the workday. Tr. at 56–57. The VE stated there would be no jobs available. Tr. at 57.

The ALJ asked the VE how many absences were generally permitted each month. *Id.* The VE indicated one absence would generally be permitted and three absences would likely lead to termination. *Id.* He indicated whether two absences per month would be tolerated would depend on the individual's other job performance and the particular supervisor. *Id.*

Plaintiff's attorney asked the VE to assume that the hypothetical individual would require a walker to stand and to ambulate. Tr. at 58. He questioned whether the individual

would be able to perform the jobs previously identified. *Id.* The VE stated the assembler position would typically be performed at a bench and would not be affected by the individual's need for a walker. *Id.* Although he acknowledged that the storage facility rental clerk position would require the individual to "take [customers] out to show the various storage units," he stated he did not believe that use of a walker "would present any difficulty to performing the job." *Id.* He indicated the individual would be able to perform the reduced number of final inspector positions, even if he were required to use a walker. *Id.*

Plaintiff's attorney asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited to sitting for less than one hour in an eight-hour workday; standing and walking for less than one hour in an eight-hour workday; no repetitive use of the hands for grasping, pushing, pulling, and manipulating; no repetitive use of foot controls on the left or right; no lifting greater than five pounds; and no climbing, balancing, stooping, kneeling, crouching, crawling, or reaching with the bilateral shoulders. Tr. at 59. He asked if those restrictions would affect the individual's ability to perform the jobs previously identified. *Id.* The VE indicated they would. *Id.*

2. The ALJ's Findings

In her decision dated September 11, 2015, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2015.
2. The claimant has not engaged in substantial gainful activity since April 1, 2013, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: obesity, osteoarthritis, degenerative disc disease, and obstructive sleep apnea (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, kneeling, and crouching; no crawling; occasional exposure to pulmonary irritants and hazards; and should have the opportunity to alternate between sitting and standing.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 2, 1964 and was 48 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 15–26.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ did not properly evaluate the evidence before concluding that Plaintiff's mental impairments were not severe; and

2)      the ALJ did not consider the functional limitations imposed by Plaintiff's mental impairments and need to elevate his legs in assessing the RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to

impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520 and § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b) and § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward

---

assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525 and § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii) and § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526 and § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h) and § 416.920(h).

with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S.

at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Severity of Mental Impairments

Plaintiff argues that despite significant evidence that his mental impairments caused limitations, the ALJ improperly concluded that they were not severe. [ECF No. 14 at 29]. He maintains the ALJ did not assess the entire record and did not adequately explain her evaluation under the special technique in 20 C.F.R. § 404.1520a and § 416.920a. *Id.* at 29–31.

The Commissioner contends the ALJ properly considered the totality of the record and cited substantial evidence to support her finding that Plaintiff's mental impairments were not severe and did not cause work-related limitations. [ECF No. 15 at 5–7]. She maintains the medical evidence and opinions of record support the ALJ's finding. *Id.* at 6. She contends that Plaintiff has failed to cite any particular evidence the ALJ ignored. *Id.* at 8.

If the evidence suggests that a claimant has a medically-determinable mental impairment, the ALJ must use a special technique to evaluate its severity. 20 C.F.R. §

404.1520a(a) and § 416.920a(a) (effective Jun. 13, 2011 to Jan. 16, 2017). She must first evaluate the claimant's relevant symptoms, signs, and laboratory findings to determine whether he has a medically-determinable impairment. 20 C.F.R. § 404.1520a(b)(1) and § 416.920a(b)(1) (effective Jun. 13, 2011 to Jan. 16, 2017). This requires that the ALJ "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [her] findings in accordance with paragraph (e) of this section" before "rat[ing] the degree of functional limitation resulting from the impairment(s)." *Id.*

The ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of [the claimant's] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." 20 C.F.R. § 404.1520a(c)(1) and § 416.920a(c)(1)) (effective Jun. 13, 2011 to Jan. 16, 2017). She should rate the degree of functional limitation based on the extent to which the claimant's mental impairments affect his ability to function independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. § 404.1520a(c)(2) and § 416.920a(c)(2). This involves considering factors such as the quality and level of the claimant's overall functional performance, any episodic limitations, the amount of supervision or assistance he requires, and the settings in which he is able to function. *Id.* The ALJ should evaluate the degree of functional limitation as none, mild, moderate, severe, or extreme in the broad functional areas of ADLs, social functioning, and concentration, persistence, or pace and should assess the

number of episodes of decompensation the claimant has experienced.[6] 20 C.F.R. §
404.1520a(c)(3), (4) and § 416.920a(c)(3), (4).

The ALJ's decision must "incorporate the pertinent findings and conclusions
based on the technique" and "show the significant history, including examination and
laboratory findings, and the functional limitations that were considered in reaching a
conclusion about the severity of the mental impairment(s)." 20 C.F.R. § 404.1520a(e)(4)
and § 416.920a(e)(4). She must make a specific finding "as to the degree of limitation in
each of the functional areas." 20 C.F.R. § 404.1520a(e)(4) and § 416.920a(e)(4).

If the ALJ rates the degree of functional limitation as none or mild in all of the
broad functional areas and finds that the claimant has had no periods of decompensation,
she should find that the claimant's impairment is not severe, "unless the evidence
otherwise indicates that there is more than a minimal limitation in [the claimant's] ability
to do basic work activities." 20 C.F.R. § 404.1520a(d)(1) and § 416.920a(d)(1) (effective
Jun. 13, 2011 to Jan. 16, 2017), citing 20 C.F.R. § 404.1521 and § 416.921(effective to
March 26, 2017) ("An impairment or combination of impairments is not severe if it does
not significantly limit your physical or mental ability to do basic work activities."). A

---

[6] "Episodes of decompensation are exacerbations or temporary increases in symptoms or
signs accompanied by a loss of adaptive functioning, as manifested by difficulties in
performing ADLs, maintaining social relationships, or maintaining concentration
persistence, or pace." 20 C.F.R., Pt. 404, Subpart P, App'x 1, § 12.00(C)(4) (effective
August 12, 2015 to May 23, 2016). An episode of decompensation may be inferred from
evidence of a significant adjustment to medication, a need for a more structured
psychological support system (e.g., hospitalization, being placed in a halfway house, or
being placed in a highly structured and directing household), and other evidence that
suggests an incident of exacerbation occurred. *Id.* The number of episodes of
decompensation should be considered over the course of a year. *Id.*

finding that a claimant has an extreme degree of limitation in a broad functional area or has experienced four or more periods of decompensation "is incompatible with the ability to do any gainful activity." 20 C.F.R. § 404.1520a(c)(4) and § 416.920a(c)(4). If the claimant has a moderate or severe degree of limitation in the first three functional areas or one or more episodes of decompensation, the ALJ should consider whether the mental impairment meets or is equivalent in severity to a listed mental disorder. 20 C.F.R. 404.1520a(d)(2) and § 416.920a(d)(2). If the ALJ finds that the mental impairment does not meet or equal a Listing, she should consider it in assessing the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3) and § 416.920a(d)(3).

The ALJ's recognition of a single severe impairment at step two ensures that she will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). This court has generally found no reversible error where the ALJ erroneously found an impairment to be severe at step two, but considered the impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

However, in *Patterson v. Commissioner of Social Security Administration*, 846 F.3d 656, 662 (4th Cir. 2017), the court determined that in considering the severity of a mental impairment "the weight of authority suggests that failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure

prevents, or at least substantially hinders, judicial review." It further stated "[w]ithout documentation of the special technique, it is difficult to discern how the ALJ treated relevant and conflicting evidence." *Id.* It found that because it could not review "the ALJ's mental-impairment evaluation," it could not "say that he properly assessed Patterson's RFC" and because it could not "gauge the propriety of the ALJ's RFC assessment," it could not "say that substantial evidence supports the ALJ's denial of benefits." *Id.*

In the instant case, the ALJ acknowledged that Plaintiff received treatment for anxiety and depression, but "agree[d] with the State agency psychological consultants' mental assessments in finding the claimant's alleged depression [was] not 'severe' as defined in the Regulations." Tr. at 15. She found that the psychological consultants' opinions were "consistent with the medical evidence of record as a whole." *Id.* She stated Plaintiff had "predominantly treated with his primary care provider for anxiety and depression" and had reported improvement with medication. Tr. at 15–16. She noted that Plaintiff had normal affect; provided good medical history; was able to count from zero to 10 and from 10 to zero; was able to count by threes; and reported ADLs that included driving and shopping during a consultative examination in September 2013. Tr. at 16. The ALJ noted that Plaintiff began receiving mental health treatment in April 2014, but found that the treatment notes showed fairly normal status upon examination. *Id.* She acknowledged Plaintiff's April 2015 hospitalization for suicidal ideation, but found that it was related to family stressors and his feeling that he was a burden on his wife. *Id.* She noted that Plaintiff's condition was stable at the time of his release. *Id.*

37

In considering the special technique in 20 C.F.R. § 404.1520a and § 416.920a, the ALJ found Plaintiff's symptoms of depression and anxiety caused no limitation in ADLs; mild difficulties in maintaining social functioning; mild difficulties in concentration, persistence, or pace; and no extended episodes of decompensation. Tr. at 16.

The Fourth Circuit's holding in *Patterson* suggests that the ALJ did not adequately apply the special technique in the instant case. In *Patterson*, the court stated the ALJ "did not explain how he weighed all relevant evidence: he did not rate Patterson's four areas of functional limitation listed in § 404.1520a(c)(3) according to the prescribed scale, nor did he explain how he reached his conclusions about the severity of the mental impairment." *Id.*, citing 20 C.F.R. § 404.1520a(c) and 404.1520a(d). Thus, the court concluded that there are two elements to the ALJ's duty to explain his application of the special technique. *See id.* First, the ALJ is required to rate the plaintiff's degree of limitation in each of the "four areas of functional limitation." *See id.* Second, she must explain how she determines the degree of limitation in each of the four areas. *See id.*

Unlike the ALJ in *Patterson*, the ALJ in the instant case satisfied the first element under the special technique in that she rated Plaintiff's degree of limitation in each of the four broad functional areas. Although she cited evidence to support her finding that Plaintiff's mental impairments were not severe, she did not reference specific evidence to support the degree of limitation she assessed in each of the four broad functional areas. *See* Tr. at 15–16. Thus, she did not explain how she determined that Plaintiff had no limitation in ADLs; mild difficulties in maintaining social functioning; mild difficulties

in concentration, persistence, or pace; and no extended episodes of decompensation. *See id.*

The ALJ ignored Plaintiff's complaints of racing thoughts, crying spells, agitation, irritability, anxiousness, sleep disturbance, overeating, isolation from others, decreased energy, and mood swings. *See* Tr. 51–52 (hearing testimony); Tr. at 666, 676, 686, 681, 694, 698, 709–10, 713 (reports to Mr. Sims); Tr. at 881 (complaints to Ms. McNeal); Tr. at 861, 862, 873, 875 (accounts to Ms. Eddington); and Tr. 892 (indications to Mr. Roseboro). She did not address the abnormalities Plaintiff's mental health providers observed. *See, e.g.*, Tr. at 596 (observing Plaintiff to be nervous during ER visit); Tr. at 686 (noting that Plaintiff had poor insight, abnormal affect, impaired recent memory, and was anxious, depressed, and agitated); Tr. at 865–66 (stating Plaintiff had easily distracted attention and concentration and anxious and depressed mood); Tr. at 861 (indicating Plaintiff was tearful during the visit); Tr. at 887 (describing Plaintiff as unkempt, showing an inappropriate affect, appearing nervous, demonstrating below average language skills, and smiling inappropriately). The ALJ neglected treatment notes from Piedmont Medical Center and Aurora Pavilion that described significant psychological symptoms. *See* Tr. at 403–59 (describing suicidal ideation with a plan to poison himself with carbon monoxide); Tr. 473 (providing discharge diagnoses of depression due to general medical condition, and severe, recurrent major depression); Tr. 477 (observing that Plaintiff had a sad and constricted affect and a dysphoric mood at time of discharge).

The ALJ failed to reconcile evidence that was contrary to the degree of limitation she assessed in each functional area. *See id.* In discussing the opinion evidence, the ALJ noted that she accorded some weight to Dr. Williamson's opinion, but rejected her impression that Plaintiff would be moderately limited in his abilities to carry out complex instructions, to understand and remember complex instructions, and to make judgments on complex work-related decisions. Tr. at 21. She stated "the objective findings, treatment notes, and reported activities of daily living as a whole are not consistent with a finding of any moderate limitations," but she did not explain why she found the evidence to be inconsistent. *Id.* She did not attempt to reconcile Dr. Williamson's impressions that Plaintiff's focus would be decreased and that he would have impaired interactions because of "low mood." Tr. at 595–96. The ALJ stated she gave great weight to the state agency psychological consultants' opinions because she found them to be "consistent with substantial evidence of record as well as the majority of Dr. Williamson's opinion." Tr. at 21. However, her rating of no limitation in ADLs was contrary to the state agency consultants' rating of a mild degree of limitation in the area. *Compare* Tr. at 16, *with* Tr. at 64 and 86. In addition, the state agency consultants rendered their opinions in September and December 2013. *See* Tr. at 64–65 and 86–87. Their opinions were generally consistent with the evidence at the time, which reflected few complaints or objective symptoms of mental impairment, but records subsequent to their assessments include more frequent complaints and significant objective findings.

Even though the ALJ noted that Plaintiff had been "treated inpatient for about a week" for suicidal ideation in April 2015, she concluded that the record showed no

episodes of decompensation. *See* Tr. at 16. The evidence indicates Plaintiff was hospitalized from April 2 to April 10, 2015, for suicidal ideation. Tr. at 403–77. Pursuant to 20 C.F.R. § 404.1520a(d)(1) and § 416.920a(d)(1), a finding that a mental impairment is not severe is only directed if the claimant has experienced no episodes of decompensation. The fact that Plaintiff had experienced at least one extended episode of decompensation in the months prior to the hearing indicates his mental impairments were severe under the Regulations and required the ALJ to further assess the impairment under the Listings and as part of the RFC analysis.

Because the ALJ did not adequately support and explain her conclusion regarding the severity of Plaintiff's mental impairments or reconcile evidence contrary to her conclusions, she failed to comply with the requirements of 20 C.F.R. § 404.1520a and § 416.920a, as interpreted by the Fourth Circuit in *Patterson*, 846 F.3d at 662. Therefore, the undersigned recommends the court find the ALJ did not adequately consider the severity of Plaintiff's mental impairments at step two. While an error at step two may be found harmless if the ALJ considers the impairment at subsequent steps, *Patterson* indicates that a failure to follow the special technique cannot be found harmless under these circumstances. In addition, as explained below, a review of the decision as a whole does not reveal that the ALJ considered Plaintiff's mental impairments in assessing his RFC. Therefore, the undersigned further recommends the court decline to find harmless the ALJ's error in assessing the severity of Plaintiff's mental impairments.

2.     RFC Assessment

Plaintiff argues the ALJ's RFC assessment does not address his ability to perform all relevant job-related functions. [ECF No. 14 at 27]. He maintains that the ALJ failed to address his need to elevate his feet without explaining her reason for rejecting the purported limitation. *Id.* at 28. He submits that the ALJ neglected to consider the functional limitations imposed by his mental impairments. *Id.* at 35. He contends the ALJ failed to consider the combined effect of all his impairments. *Id.* at 33–34.

The Commissioner argues the ALJ considered the entire record in concluding that Plaintiff's mental impairments caused no work-related limitations. [ECF No. 15 at 5–7]. She maintains the ALJ cited substantial evidence to support her conclusion that Plaintiff did not need to elevate his legs. [ECF No. 15 at 8]. She submits that the ALJ specified that she had considered Plaintiff's non-severe mental impairments in combination with his other impairments in assessing his RFC. *Id.* at 8–9.

A claimant's RFC represents the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a) and § 416.945(a). It must be based on all the relevant evidence in the case record and should account for all of the claimant's medically-determinable impairments. *Id.*

The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7 (1996). The ALJ must determine the claimant's ability to perform work-related physical and mental abilities on a regular and

continuing basis. *Id.* at *2. She must explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* at *7. "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ should consider the combined effect of all the claimant's impairments "without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523 and § 416.923 (effective to March 27, 2017). When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all those impairments in determining the claimant's RFC and his disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how she evaluated the combined effects of a claimant's impairments). Although the Fourth Circuit has declined to elaborate on what serves as adequate explanation of the combined effect of a claimant's impairments, this court has specified that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), *citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)). Furthermore, absent evidence to the

contrary, the courts should accept the ALJ's assertion that she has considered the combined effect of the claimant's impairments. *See Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014.

The ALJ determined that Plaintiff had the RFC to perform light work that allowed him to alternate between sitting and standing and required no crawling or climbing of ladders, ropes, or scaffolds and occasional balancing, kneeling, crouching, climbing of ramps or stairs, and exposure to pulmonary irritants and hazards. Tr. at 17. She cited some medical treatment notes, Plaintiff's function reports and testimony, and the opinions provided by Dr. Williamson, Mr. Sims, and the state agency psychological consultants. Tr. 18–21. She noted that Plaintiff alleged functional limitations that included abilities to stand for three minutes, walk for 20 yards, sit for 20 minutes with his feet elevated, and lift 10 pounds; poor motivation; impaired balance; pain-related distraction; and a need to ambulate with an assistive device. Tr. at 18. She stated she had considered obesity in combination with Plaintiff's other impairments, but concluded that his impairments would not preclude him from performing the work activity described in the RFC assessment. Tr. at 20. She determined the objective evidence did not support the severity of the pain and the functional limitations Plaintiff alleged. Tr. at 20–21. She summarized her finding as follows:

> In sum, the above residual functional capacity is supported by the treatment and examining records that document reports of back and joint pain as well as morbid obesity, but do not include substantial objective findings; the claimant's reported activities of daily living, including attending church twice a week where he plays guitar, driving, and performing some household chores; the fact that he had fairly normal mental status upon treatment and typically denied suicidal ideation; and received nothing more

than conservative care for his allegedly debilitating pain as well as his mental impairments.

Tr. at 22–23.

As an initial matter, the undersigned rejects the Commissioner's argument that Plaintiff waived his right to challenge the ALJ's failure to include additional restrictions in the RFC assessment because his counsel failed to object to the ALJ's hypothetical questions to the VE or to present alternative hypothetical questions that accounted for the restrictions. [ECF No. 15 at 9–10]. In light of the non-adversarial nature of Social Security cases, the Supreme Court has generally rejected the notion that claimants are required to exhaust issues at the administrative level to preserve them for judicial review. *See Sims v. Apfel*, 530 U.S. 103, 112 (2000) (holding that claimants were not required to present issues to the Appeals Council to preserve them for judicial review).

A review of the ALJ's RFC assessment shows that she did not include any mental restrictions. Tr. at 17–23. As discussed above, she failed to address contradictory evidence in the record and provided inadequate reasons for her finding that Plaintiff's mental impairments were non-severe. Therefore, remand is warranted under *Mascio*, 780 F.3d at 636, because the ALJ did not adequately assess Plaintiff's capacity to perform relevant mental functions, despite contradictory evidence in the record.

Although the ALJ purported to have considered the combined effect of Plaintiff's impairments in assessing his RFC, a review of her decision as whole does not reveal this to be correct. The record contains evidence that suggests Plaintiff's mental problems were worsened by his physical problems and vice versa. *See* Tr. at 460–77 (Plaintiff's

reports of overeating when he felt depressed; being unable to exercise because he was easily tired, secondary to his weight; and feeling like a burden to his wife because he required her assistance to engage in ADLs); Tr. at 683 (Plaintiff's indications that his back pain was so severe that he had difficulty walking with a walker and was a burden to his family because of assistance he required); and Tr. at 730 (Plaintiff's complaint of increased depression and fewer ADLs because of decrease mobility). Despite this evidence, the ALJ failed to consider whether Plaintiff's RFC had been further reduced by the combined effect of all his severe and non-severe impairments. Therefore, the ALJ's RFC assessment does not comply with the provisions of 20 C.F.R. § 404.1523 and § 416.923 (effective to March 27, 2017) or the Fourth Circuit's holding in *Walker,* 889 F.3d at 49–50.

In addition, because the evidence suggests that Plaintiff might need to elevate his lower extremities (Tr. at 44, 354, 555, 668, 672–73, 679, 683, 691, 696, 703–04, 707, 711, 714–15, 722, 728–29, 735, and 737), and the ALJ failed to resolve this evidence, the undersigned recommends the ALJ consider it in reassessing Plaintiff's RFC on remand.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of

42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

November 21, 2017                          Shiva V. Hodges
Columbia, South Carolina                United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).